**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 13-cv-2513-WJM-KMT

CHARLES REINHARDT,
RICHARD BURNS, *et al.*,

    Plaintiffs,

v.

MARCELO KOPCOW,
DR. GLENN E. NIEBLING,
JAMES VINING, *et al.*,

    Defendants.

---

**ORDER GRANTING MOTIONS TO DISMISS FILED BY
DEFENDANTS NIEBLING AND VINING**

---

Plaintiff Richard Burns and his family members ("Plaintiffs") bring this civil action under 42 U.S.C. § 1983 against multiple Defendants who are involved with the management and treatment of sex offenders in the state of Colorado, including Dr. Glenn E. Niebling and James Vining ("Defendants").[1] (ECF No. 81.) This matter is before the Court on Defendant Niebling's Motion to Dismiss (ECF No. 103) and Defendant Vining's Motion to Dismiss (ECF No. 112) (together "Motions"). For the reasons set forth below, the Motions are granted.

## I. LEGAL STANDARD

Defendants move to dismiss the claims against them in accordance with Federal Rule of Civil Procedure 12(b)(6), which permits a defendant to move to dismiss a claim

---

[1] There are many other Plaintiffs and Defendants named in this action but these are the only parties whose claims are relevant to the instant motions.

in a complaint for "failure to state a claim upon which relief can be granted." In evaluating such a motion, a court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. BACKGROUND

The relevant facts[2], taken as true based on the allegations in the operative complaint, are as follows.

Plaintiff Richard Burns is a 39-year-old survivor of child sex abuse and incest. (Sec. Am. Compl. ("SAC") (ECF No. 81) ¶ 30.) Mr. Burns is married and has four minor children; his wife and children are also named Plaintiffs in this case. (*Id.*)

In October 2009, Mr. Burns became concerned with his inability to control his

---

[2] This Order sets forth only a small portion of the facts alleged in the Second Amended Complaint. (*See* ECF No. 81.) Specifically, the Court has included only those allegations which involve or relate to Plaintiff Burns, Defendant Niebling, and Defendant Vining as those are the only allegations relevant to the issues raised by the Motions.

desire to view pornography and sought counseling with a private therapist. (*Id*.) Despite the fact that Mr. Burns never stated that he had harmed or molested his four daughters or had any fantasies, thoughts, or sexual contact with minor children, this therapist reported Mr. Burns to Douglas County Department of Social Services for child abuse. (*Id*.) The investigation into these allegations was closed in December 2009 with a finding of no abuse. (*Id*.) During this investigation, Mr. Burns was allowed to live at home, and to take his youngest daughter out-of-state for a week. (*Id*. ¶ 31.)

In conjunction with this investigation, police executed a search warrant on Mr. Burns's home and retrieved fragments of pornographic pictures from his computer. (*Id*.) Because some of these images involved children, Mr. Burns was charged with and pled guilty to one count of "sexual exploitation of a child, twenty or more items". (*Id*.) Mr. Burns was given a deferred judgment and sentence. (*Id*.)

In autumn 2010, Mr. Burns was required to undergo a Psychosexual Evaluation ("PSE") and Parental Risk Assessment ("PRA") through CareNet Counseling in Denver. (SAC ¶ 31.) Dr. Glenn Niebling conducted these exams. (*Id*.) Mr. Burns was rated as "Low to Low-Moderate Risk" in the PSE and "Low Risk" on the PRA. (*Id*.) In his report on the PRA, Dr. Niebling specifically stated that it is in the best interest of Mr. Burns and his family that he be allowed to live at home and have contact with his children during his probationary period. (*Id*.)

Despite Dr. Niebling's findings and recommendations, on February 11, 2011, the 18th Judicial District Probation Department instructed Mr. Burns to move out of his family home and have no contact with his children. (SAC ¶ 32.) While Mr. Burns was

permitted to have contact with his wife, he was not allowed to talk about their children, which forced his wife to make significant family decisions without her husband's involvement. (*Id.*)

Mr. Burns is a deeply religious practicing Catholic, and many of his closest friends are priests at his church. (SAC ¶ 34.) One of the conditions of his probation was that he not attend mass or any other religious service at any church. (*Id.*) On Memorial Day 2011, Mr. Burns visited the Priests' Rectory at his church for a private mass with two of his closest friends. (*Id.*) The priests had arranged for his private mass because they knew he was not permitted to attend regular mass, and believed that he was lonely and depressed. (*Id.*) As the Rectory was a private residence and no other parishioners were in attendance, Mr. Burns did not believe that he was violating probation. (*Id.*) Therefore, Mr. Burns called his location into his tracking service and included the visit in his weekly report to his probation officer. (*Id.*)

In the Fall of 2011, based in large part on Mr. Burns's "major rules violation" of attending the private mass, his probation officer directed him to be placed in a "Shared Living Arrangement" ("SLA"). (*Id.*) In an SLA, probationers are randomly paired with another person and must rent an apartment in an approved location. (SAC ¶ 35.) Probationers in SLA may leave their apartments only for approved reasons, and may not have any visitors without prior approval. (*Id.*) Probationers may not be alone in their apartments for more than two hours, and are required to report any misdeeds by their roommates. (*Id.*)

In September 2011, Mr. Burns was instructed by Ms. Andrea Bennett-Bailey, his

4

probation officer, that no priests were allowed to visit his SLA, and that he was to have no contact with priests in general. (SAC ¶ 36.) Ms. Bennett-Bailey also made him remove religious artifacts, including artwork containing cherubs due to their "images of nude children". (*Id.*)

As a condition of his probation, Mr. Burns was required to attend therapy with Defendant James Vining, who was in charge of the "Intensive Group" to which Mr. Burns was assigned, as well as being in charge of the SLA program. (SAC ¶ 37.) Mr. Vining verbally abused Mr. Burns, continually mocking his Catholic faith and his love for his family. (*Id.*) Mr. Vining's abuse caused Mr. Burns to break down in tears on a number of occasions, which led Mr. Vining to further belittle Mr. Burns. (*Id.*)

In June 2012, Mr. Vining submitted a report to the Probation Office stating that Mr. Burns was not at his SLA during a home visit and that Mr. Burns had gone out to lunch, which is a violation of his probation conditions. (*Id.*) In reality, Mr. Burns was at a computer check and had verification to prove his whereabouts. (*Id.*) Mr. Vining refused to accept Mr. Burns's documentation of his whereabouts and continued to falsely report to probation that Mr. Burns had gone out to eat. (*Id.*)

In November 2012, Mr. Burns had "a psychotic break from reality", attempted suicide, and was hospitalized at St. Joseph's Hospital. (SAC ¶ 38.) Dr. Niebling refused to permit Mr. Burns's priest access to Mr. Burns so that he could administer Last Rites, instead telling Mr. Burns that priests are not a good influence on him, and that all priests are pedophiles. (*Id.*) Dr. Niebling is a Lutheran Deacon who repeatedly made negative comments about Catholics during therapy sessions. (*Id.*)

In January 2013, Dr. Niebling and Mr. Vining terminated Mr. Burns from treatment because he failed to report that his SLA roommate was sneaking out at night. (SAC ¶ 39.) Mr. Burns alleges that he did not know his roommate was leaving because he was asleep. (*Id*.) Dr. Niebling also believed that Mr. Burns had made a sexual reference to an old friend over a social networking website. (*Id*.) Mr. Burns disputes Dr. Niebling's assessment of his interaction. (*Id*.)

Because Mr. Burns was terminated from treatment, his deferred judgment and sentence was revoked, and he was sentenced to two years in the Colorado Department of Corrections. (SAC ¶ 40.) Since his incarceration, he has continued to be denied access to his daughters. (SAC ¶ 41.) They are unable to visit him, he cannot speak with them over the telephone, and he cannot discuss them with his wife. (*Id*.)

Based on these factual allegations, Plaintiffs contend that Dr. Niebling and Mr. Vining violated Mr. Burns's First and Fourteenth Amendment rights by interfering with his family relationships, his religious practice, and his association with friends. (SAC ¶ 95.)

### III. ANALYSIS

A claim under § 1983 "requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law." *Wittner v. Banner Health*, 720 F.3d 770, 773 (10th Cir. 2013) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982)). Defendants' Motions challenge the second of these requirements, arguing that Plaintiffs have failed to show that Defendants acted under color of law. (ECF No. 75 at 7.)

The "under color of law" requirement in § 1983 cases is identical to the state

action requirement of the Fourteenth Amendment. *Lugar*, 457 U.S. at 928. For a deprivation of a right to be committed under color of law, it "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* at 937. "[M]erely private conduct, no matter how discriminatory or wrongful," cannot provide the grounds for a claim brought under § 1983. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).

While the Supreme Court has emphasized that the state action inquiry is one that is necessarily fact-intensive, *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001), the Tenth Circuit has set forth four tests under which a private actor may be held accountable as a state actor for a constitutional deprivation: (1) the "nexus test," (2) the "public function test," (3) the "joint action test," and (4) the "symbiotic relationship test." *Wittner*, 720 F.3d at 775. The Court will discuss each of these tests in turn.

**A.   Nexus Test**

The nexus test allows state action to be imputed to a private party when "there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the State itself." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1142, 1448 (10th Cir. 1995) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Such a nexus exists only when a state "has exercised coercive power or has provided such significant encouragement, either overt

or covert, that the [private conduct] must in law be deemed to be that of the State." *Id*. (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

Plaintiffs do not specifically address the nexus test in their response to the Motions, relying on general allegations regarding state action. First, Plaintiffs appear to generally argue that Dr. Niebling's examination of Mr. Burns resulted in his placement in SLA, which forced him to be separated from his family. (ECF No. 129 at 13.) However, this argument is not supported by the pleadings in this case, upon which the Court must base its ruling. Per the allegations in Plaintiffs' Second Amended Complaint, Dr. Niebling recommended that Mr. Burns be permitted to live with and have contact with his family during his treatment. (SAC ¶ 31.) Plaintiffs plainly allege that the 18th Judicial District Probation Department "overrode" Dr. Niebling's recommendation, and instructed Mr. Burns to move out of his family home and discontinue contact with his family. (SAC ¶ 32.) Thus, Plaintiffs have failed to allege sufficient facts to show that there is a nexus between Dr. Niebling's examination and Mr. Burns's placement in an SLA.

Plaintiffs next contend that aspects of Mr. Burns's counseling and the conditions placed on him while in the SLA—such as his inability to practice his Catholic faith or consult with priests—were imposed by Dr. Niebling and Mr. Vining. (ECF No. 129 at 14.) To satisfy the nexus test, a plaintiff must show that a private individual's actions were compelled by the state. *See Pino v. Higgs*, 75 F.3d 1461, 1466 (10th Cir. 1996) (physician did not act under color of law when there was no evidence that his medical opinions were compelled by the state). Here, Plaintiffs have not alleged that the conditions of Mr. Burns's treatment were mandated by the Probation Office or Mr. Burns's probation officer. Instead, he has alleged that Dr. Niebling had a personal bias

8

against Catholics, and that this resulted in his refusal to allow Mr. Burns access to Catholic priests during his treatment. (SAC ¶ 38.) Thus, Plaintiffs have failed to plead sufficient facts to show that any condition imposed on Mr. Burns during his treatment was a state action under the nexus test.

Finally, Plaintiffs contend that Dr. Niebling and Mr. Vining terminated him from treatment, which resulted in his incarceration and further isolation from his family. (ECF No. 129 at 13-14.) Again, Plaintiffs have failed to link the decision to terminate Mr. Burns from the treatment program to any directive by the Probation Office or Mr. Burns's probation officer. Instead, Plaintiffs allege that Mr. Burns was terminated from treatment for a number of violations of rules which were established by the private treatment facility, and which have no connection to the State. (SAC ¶ 39.) Thus, Plaintiffs have failed to allege sufficient facts to show that Mr. Burns's termination from treatment was compelled by the State so as to satisfy the nexus test.

**B.     Public Function Test**

The public function test inquires whether the challenged action "is a traditional and exclusive function of the state." *Wittner*, 720 F.3d at 777. "This test is difficult to satisfy. While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Gallagher*, 49 F.3d at 1456 (internal quotation marks omitted). Traditional and exclusive functions of the state include such functions as administering public elections, operating towns, or managing city parks, but not educating children or enforcing statutory liens. *See id.*

Plaintiffs contend that "pursuant to the 'public function' test . . . , Vining and

Niebling were acting as state actors when they made the decision, along with his probation officer, to deny him contact with his children and even denied him permission to talk about his children with his wife and parents. (ECF No. 129 at 13-14.) There are multiple problems with this argument. First, the degree to which Dr. Niebling and Mr. Vining worked in concert with Mr. Burns's probation officers is irrelevant to the public function test; their coordinated activity is relevant to the nexus and/or joint action test. Second, Plaintiff's Second Amended Complaint does not allege that Dr. Niebling and Mr. Vining took part in the decision to deny Mr. Burns access to his family. Instead, the Complaint plainly states that Dr. Niebling recommended that Mr. Burns be permitted to live with his family during treatment, and that the 18th Judicial District Probation Department "overrode" that recommendation. (SAC ¶¶ 31-32.) The Complaint alleges that it was the Probation Department that "instructed Mr. Burns to move out of the family home and have no contact with the children." (*Id*. ¶ 32.) Thus, Plaintiff's argument that Dr. Niebling and Mr. Vining worked in concert with the Probation Department to deprive him of access to his family is neither supported by the pleadings in this case, nor relevant to the public function test.

Proper application of the public function test requires looking at whether the services provided by the Defendants—sex offender treatment and therapy—are traditional and exclusive functions of the state. *See Wittner*, 720 F.3d at 777. Plaintiffs have not cited any authority supporting a finding that operating a sex offender counseling and treatment facility is a traditional and exclusive function of the state, and the Court has found none. Rather, Mr. Burns sought private counseling related to his sexual proclivities before he had any involvement with the state, which suggests that

the treatment of sex offenders is not exclusively reserved to the state.

Therefore, the Court finds that Plaintiffs have failed to plead sufficient facts to show that Mr. Vining and Dr. Niebling perform functions that are tradition and exclusive functions of the state.

**C.      Joint Action Test**

The joint action test asks whether the state and the private party have "acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher*, 49 F.3d at 1453.  To constitute state action, the joint action must involve the state in an active role; private action taken "'with the mere approval or acquiescence of the State is not state action.'"  *Wittner*, 720 F.3d at 777 (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52).

Plaintiffs allege that Dr. Niebling and Mr. Vining together decided to terminate him from the treatment program, which constitutes joint action.  (SAC ¶ 39.)  However, both Dr. Niebling and Mr. Vining are private individuals, and thus this collaboration is not joint action with the state.  Plaintiffs have not alleged that the Probation Department or any other state actor was involved with the decision to terminate Mr. Burns from the treatment program.  Thus, Plaintiffs have failed to plead any joint action related to Mr. Burns's termination from the treatment program.

In their opposition brief, Plaintiffs argue that Dr. Niebling and Mr. Vining "acted in concert" with the Probation Department "to restrict Mr. Burns'[s] liberty and ability to interact with his immediate family members." (ECF No. 129 at 14.)  However, this argument is not supported by the pleadings, which plainly state that the Probation Department imposed the restriction on family contact, and that this limitation

contradicted Dr. Niebling's recommendation that Mr. Burns be permitted to continue living with his family during treatment. (SAC ¶¶ 31-32.) Thus, Plaintiffs have failed to allege facts showing that Dr. Niebling and Mr. Vining were joint actors with the state in the decision to enact restrictions on Mr. Burns's access to his family.

As there is no evidence supporting a finding that Defendants acted in concert with the state in depriving Plaintiffs of their constitutional rights, the Court finds that Plaintiffs have failed to sufficiently allege that Dr. Niebling and Mr. Vining were state actors under the joint action test.

### D.    Symbiotic Relationship Test

The symbiotic relationship test asks whether the state has "so far insinuated itself into a position of interdependence with a private party that it must be recognized as a joint participant in the challenged activity." *Gallagher*, 49 F.3d at 1451 (internal quotation marks omitted). This analysis "starts by asking whether and to what extent the state's relationship with the private actor goes beyond the 'mere private purchase of contract services.'" *Wittner*, 720 F.3d at 778 (quoting *Brentwood Acad.*, 531 U.S. at 299) (brackets omitted); *see also Gallagher*, 49 F.3d at 1453 ("Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity."). "[A] public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities." *Wittner*, 720 F.3d at 778.

In *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), the Tenth Circuit found a

symbiotic relationship between the state and a private school for behaviorally challenged boys. 691 F.2d at 940. The school in *Milonas* had students placed there for entire school terms by courts, state agencies, and public school districts; received significant state funding to mitigate tuition, which it touted to prospective students; and its educational program was extensively regulated by the state. *Id.* In *Wittner v. Banner Health*, the Tenth Circuit contrasted the defendant hospital's state contract to provide involuntary psychiatric holds with the school arrangement in *Milonas*, and found no symbiotic relationship. 720 F.3d at 778-79. The hospital in *Wittner* had a contract authorizing acceptance of patients for involuntary holds of only 72 hours; allowed the hospital to accept or reject patients in its discretion; did not involve extensive state participation in patient care; and did not involve the state's dictation of the medical program. *Id.*

Plaintiffs do not specifically address the symbiotic relationship test in their opposition brief. (ECF No. 129 at 13-15.) Having reviewed the relevant case law, the Court finds that the relationship between the Probation Department and Dr. Niebling and Mr. Vining—as part of the treatment team at CareNet—is more akin to the hospital in *Wittner* than the school in *Milonas*. Per the allegations in Plaintiffs' Complaint, the Probation Department contracted with Dr. Niebling to perform that PSE and the PRA. (SAC ¶ 31.) There is no allegation that the state had any involvement with the manner in which the testing was done, or the results that were received. (*Id.*) In fact, the Probation Department disregarded Dr. Niebling's recommendation that Mr. Burns should live with his family during treatment, and instructed Mr. Burns to move into the

13

SLA and have no contact with his family.  (SAC ¶ 32.) The Probation Department is also alleged to have imposed the restriction regarding contact with the Catholic clergy. (SAC ¶ 36.)

The SAC then alleges that Mr. Vining made certain treatment decisions that harmed Mr. Burns.  (SAC ¶ 37.)  However, there is no allegation that the Probation Department was involved with or encouraged these decisions.  (*Id*.)  Rather, it appears that Mr. Vining and Dr. Niebling conducted therapy according to their own preferences and policies, and then reported Mr. Burns's compliance to the Probation Department. (*Id*.)  Significantly, Plaintiffs do not allege that the Probation Department was involved with the decision to terminate Mr. Burns from treatment.  The SAC pleads that the decision was made only by Dr. Niebling and Mr. Vining because Mr. Burns failed to inform CareNet's staff that his roommate was sneaking out at night, in violation of CareNet's policies.  (SAC ¶ 39.)

Thus, the Court finds that Plaintiffs have pled a relationship between the state and CareNet (including Dr. Niebling and Mr. Vining) that is more akin to client and contractor, than it is to the commingled responsibilities necessary to satisfy the symbiotic relationship test.

## IV.  CONCLUSION

As the Court has found Defendants to be private actors under all four tests for state action, it concludes that Plaintiffs has failed to plead sufficient facts showing that Defendants were acting under color of law when they committed the challenged conduct.  Accordingly, the Court ORDERS as follows:

1. Defendant Dr. Glenn E. Niebling's Motion to Dismiss (ECF No. 103) is

       GRANTED;

2.     Defendant James Vining's Motion to Dismiss (ECF No. 112) is GRANTED;

3.     All claims against Dr. Glenn E. Niebling and James Vining are DISMISSED WITH PREJUDICE and they are TERMINATED as Party-Defendants to this action; and

4.     In all future filings, the parties shall AMEND the caption in this case to as to exclude Dr. Glenn E. Niebling and James Vining.

Dated this 28th day of August, 2014.

BY THE COURT:

_(signature)_

William J. Martinez
United States District Judge